

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| THOMAS KIMBREL, | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-01-N-1654-S |
| | ] | |
| PRIME, INC. d/b/a RUTH'S CHRIS STEAK HOUSE, | ] ] | |
| | ] | |
| Defendant(s). | ] | |

## Memorandum of Opinion

### I.   Introduction.

The court has for consideration the motion for summary judgment of defendant Prime, Inc. d/b/a Ruth's Chris Steak House ("Prime"), filed August 9, 2002. [Doc. # 45.] Plaintiff Thomas Kimbrel ("Kimbrel") claims that Prime violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA") by terminating his employment in retaliation for his threat to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").[1] [Doc. # 1, Compl.] Prime contends that summary judgment is due in its favor because Kimbrel cannot establish a prima facie case of retaliation, or in the alternative, cannot produce evidence showing that the reason for his termination proffered by Prime is a pretext for retaliation. [Doc. # 46.] Both parties having had a full and fair opportunity to brief the issues raised by Prime,[2] the motion is now ripe

---

[1] Although the complaint states a claim for discrimination under the ADA in addition to the retaliation claim, Kimbrel voluntarily dismissed his discrimination claim by motion on July 31, 2002. [Doc. ## 39, 43.]

[2] Kimbrel has not responded to defendant's motion for summary judgment.



for decision. Upon due consideration, the court is of the opinion that the motion should be granted.

## II. Standard.

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A factual dispute is genuine only if "a reasonable jury could return a verdict for the non[-]moving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991). Further, "[f]or factual issues to be considered genuine, they must have a real basis in the record." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). The moving party bears the burden of proving the absence of a genuine issue of material fact, and in evaluating the moving party's argument, the court must view the evidence in the light most favorable to the non-moving party. *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). Once the party moving for summary judgment demonstrates a lack of any genuine issues of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Allen v. Tyson Food, Inc.*, 121 F.3d 642, 646 (11th Cir. 1996) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-moving party "may not rely on his pleadings to avoid judgment against him." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (quoting *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986)). Where the non-moving party does not respond to the

motion, "summary judgment, if appropriate, shall be entered against the [non-moving] party." Fed. R. Civ. P. 56(e).

## III.   Discussion.

### A.   Undisputed Facts.

Kimbrel was employed as a server at Ruth's Chris Steak House ("Ruth's Chris"), a restaurant located inside the Embassy Suites Hotel ("Embassy Suites") in Birmingham, Alabama, from October 1997 to October 2000. Ruth's Chris's catering/banquet services and Embassy Suites' sales office work together to provide banquet functions for business groups and other organizations wishing to hold meetings or other events at Embassy Suites. Kimbrel received a Ruth's Chris employee handbook, which stated the company policy regarding attendance, absences, and tardiness in which employees were informed that failure to abide by the policy would be cause for disciplinary action, up to and including termination. The handbook also contained "Guidelines of Conduct," which listed examples of violations of company policies that could be cause for immediate disciplinary action, up to and including termination.[3] Ruth's Chris managers use managers' logs called "Red Books" to leave notes for each other about staffing and operational issues.

Sometime in the year 2000, Kimbrel was diagnosed with an anxiety disorder. His anxiety disorder manifested itself in the form of panic attacks, during which he would experience a rapid heartbeat, shortness of breath, dizziness, and sweating. Kimbrel's

---

[3] Among the examples listed in the "Guidelines of Conduct" are: acts that "convey a negative image of the reputation and image of the Company," "[e]ngaging in any . . . disorderly conduct," "[t]hreatening or using abusive language or being disrespectful or rude to any manager, guest, or other employee," "[e]xcessive absenteeism and/or tardiness," and "[f]ailure to report to work for a scheduled shift."

3

speech would become "confused" during a panic attack, although he was "somewhat" able to carry on conversations. [Kimbrel Dep. at 129.] Kimbrel also found it difficult to walk during a panic attack. Kimbrel had approximately six panic attacks over a period of more than a year. Kimbrel's panic attacks lasted from five to forty-five minutes. He never had a panic attack while at work. Sometime after October 2000, Kimbrel discontinued regular doctor's visits for treatment of his anxiety disorder, and at some point between October 2000, and the date of his deposition (July 22, 2002), his anxiety disorder went away without further medical treatment and he no longer suffers from the condition.

According to the managers' notes in the Red Book, Kimbrel "called off work" on August 29, 2000, September 5, 2000, and September 9, 2000.[4] [Doc. # 46, at 5, ¶ 22.] Tony Teichmiller ("Teichmiller"), the General Manager of Ruth's Chris at all times relevant to this action, noted on an Employee Counseling report on September 9, 2000, that he had discussed Kimbrel's absences with him. The Red Book notes that on October 5, 2000, Kimbrel exhibited performance problems during the lunch shift and did not arrive for his scheduled dinner shift. On that date Kimbrel did, eventually, report for his dinner shift; he was late because he had fallen asleep in a banquet room between his shifts. Teichmiller noted on an Employee Counseling report on October 5, 2000, that he intended to discuss plaintiff's performance with him the next day. On October 6, 2000, Teichmiller and assistant manager Dennis Harkins met with Kimbrel and told him his performance was sub-par and he would be suspended for two weeks. Teichmiller did not issue Kimbrel a write-up

---

[4] The court interprets the phrase "called off work" to mean that Kimbrel called in sick or with some other excuse as to why he would be unable to work his scheduled shift that day.

4

memorializing the suspension because he did not feel it would be appropriate under the circumstances. At that meeting, Kimbrel told Teichmiller about some of his personal problems, including that he was taking different medications that were not "regulated yet." [Kimbrel Dep. at 76, 82.]

During his suspension, Kimbrel called the restaurant to speak with employees, several of whom complained to Teichmiller about these phone calls. Additionally, several employees complained to Teichmiller that Kimbrel called them at home late at night. One employee complained to Teichmiller that Kimbrel had attended an intimate family gathering following the employee's father's funeral and proceeded to help himself to the liquor cabinet, get drunk, and make a scene. Carol Dawkins ("Dawkins"), an employee of Embassy Suites who dated Kimbrel prior to the summer or fall of 2000, complained to Teichmiller that Kimbrel made numerous threatening and insulting phone calls to her. Dawkins also told Teichmiller that on one occasion, Kimbrel made negative comments about Ruth's Chris while she was entertaining a client of the hotel at the restaurant. On October 12, 2000, Kimbrel called the restaurant at night and spoke with Jeff Barber ("Barber"), an assistant manger. Barber told Teichmiller that in this phone call, Kimbrel made threats of violence against Teichmiller and Mark Oswald, the owner of the restaurant, and that he (Barber) felt that Kimbrel might do something violent. Barber also told Teichmiller that Kimbrel planned to sue Ruth's Chris.

On October 20, 2000, Teichmiller and assistant manager Jeff Jones met with Kimbrel to inform him that he was being terminated for violating company policy. An off-duty police officer was present at the meeting because Teichmiller was afraid of how Kimbrel would

5

react. After being told that he was terminated, Kimbrel ended the meeting so that he might call his attorney. Kimbrel filed a charge of discrimination with the EEOC on October 24, 2000, alleging discrimination and retaliation under the ADA. Kimbrel was issued a right to sue letter on April 9, 2001.

### B. The ADA Retaliation Claim.

Plaintiff alleges that Prime violated the ADA by terminating him in retaliation for his threat to file an EEOC charge alleging disability discrimination. Because Kimbrel has advanced no direct evidence of retaliatory intent, the court's analysis will be guided by the familiar burden-shifting framework originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998). To establish a prima facie case of retaliation under the ADA, Kimbrel must show (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal link between the protected activity and the adverse action. *Id.* If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. This burden is one of production only, and is therefore exceedingly light. *See Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). Once the defendant has proffered a legitimate, nondiscriminatory reason for its actions, the plaintiff must produce evidence from which a reasonable jury could conclude that the employer's stated reason is mere pretext for retaliation. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

### 1.     Plaintiff's Prima Facie Case.

To satisfy the first element of the prima facie case of retaliation, the plaintiff must show that he had both a subjective belief and an objectively reasonable belief that he was engaging in a statutorily protected activity. *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). When assessing the objective reasonableness of the plaintiff's belief, the court deems the plaintiff to know the existing substantive law. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998).

Kimbrel alleges that he engaged in a statutorily protected activity because he believed his suspension was unlawfully based on a disability and he opposed this alleged discrimination by threatening to file an EEOC charge. To satisfy the first element of the prima facie case, then, Kimbrel must prove that he had an objectively reasonable belief that he suffered from a disability under the ADA. *See Standard*, 161 F.3d at 1328. A disability, for purposes of the ADA, is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12101(2).[8] While the court readily acknowledges that an anxiety disorder can qualify as a mental impairment, "[a mental] impairment, standing alone, . . . is not necessarily a disability as contemplated by the ADA." *Gordon v. E. L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). The impairment must substantially limit a major life activity. *See id.* The ADA regulations adopt the definition of "major life activities" found in the Rehabilitation Act regulations, which

---

[8] Although the definition of disability also includes having a record of such an impairment or being regarded as having such an impairment, the plaintiff's deposition testimony establishes that he did not believe that he was perceived as disabled nor did he believe he had a record of a disability. [Kimbrel Dep. at 114, 121-22.]

define the term as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Plaintiff alleges that his anxiety disorder affected his life activities of breathing, talking, seeing, and thinking because during his panic attacks, his breathing, vision, and abilities to think and carry on a conversation were impaired. While these may be major life activities, the plaintiff cannot establish that his panic attacks substantially limited these major life activities. The Supreme Court has recently construed substantially limited to mean that the impairment "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 122 S. Ct. 681, 691 (2002). Additionally, "[t]he impairment's impact must . . . be permanent or long term." *Id.* The plaintiff's deposition testimony indicates that his proof falls well short of what is required to establish that his impairment substantially limited his major life activities. Plaintiff claims to have had approximately six panic attacks over a period of more than a year, with each attack lasting between five and forty-five minutes. Plaintiff ceased taking medication for his disorder sometime after October 2000, and his panic attacks went away altogether sometime between October 2000, and July 2002. There is insufficient proof that plaintiff's temporary, non-chronic condition with no long-term impact substantially limited his major life activities. Because plaintiff cannot prove that he was substantially limited in one or more major life activities, he cannot establish that he had a disability under the ADA. Accordingly, plaintiff could not have held an objectively reasonable belief that he suffered from such a disability, and he cannot meet the first element of his prima facie case.

Moreover, the plaintiff is unable to establish the third element of his prima facie case: a causal link between protected activity and an adverse employment action. Plaintiff alleges that his termination was retaliatory because it occurred approximately one week after he told assistant manager Barber that he planned to sue Ruth's Chris. However, the timing of an adverse action is not considered *in vacuo*, but rather as only "one factor among the total circumstances." *Booth v. Birmingham News Co.*, 704 F. Supp. 213, 216 (N.D. Ala. 1988). *See also Thurman v. Robertshaw Control Co.*, 869 F. Supp. 934, 942 (N.D. Ga. 1994) ("The mere presence of a temporal sequence which shows the discharge following the [threat to file] the discrimination claim is, in and of itself, not sufficient to substantiate the requisite causal connection.").

Kimbrel cannot rely solely on the timing of his termination to establish the requisite causal link, because his own intervening conduct severs any inference of a causal connection raised by the temporal sequence of events. At the time of his termination, Kimbrel was on suspension for poor performance. During his suspension, Teichmiller received numerous complaints about plaintiff's threatening and harassing conduct. These intervening violations of company policy operate to sever any causal connection between Kimbrel's alleged protected activity and his termination. *See, e.g., Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355, 1376-77 (S.D. Fla. 2001) (inference of causal connection "severed" where evidence showed that defendant received multiple employee complaints about plaintiff's conduct, both before and after plaintiff made three discrimination complaints). Because plaintiff cannot establish a causal connection between any protected

activity in which he was engaged and his termination, he has failed to make a prima facie case of retaliation.

### 2. Pretext.

Even assuming the plaintiff had presented sufficient evidence to make a prima facie case of retaliation, he is unable to show that defendant's legitimate, non-discriminatory reason for the termination was a pretext for retaliation. Prime has met its burden of articulating a non-discriminatory reason for terminating Kimbrel: it had received numerous complaints about Kimbrel's inappropriate, harassing, and threatening conduct during his suspension. Although Kimbrel states that he did not make harassing telephone calls and does not remember threatening anyone [Kimbrel Dep. at 175, 178], merely denying the conduct attributed to him does not create a triable issue of fact as to pretext. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973) (to prove pretext, the plaintiff must "demonstrate by competent evidence that the presumptively valid reasons for [his termination] were in fact a coverup for a . . . discriminatory decision."). Kimbrel has not offered any proof that the reason articulated by Prime was not, in fact, its real reason for terminating him, nor has he shown that retaliation was the real reason he was terminated. Therefore, even if he had adduced sufficient evidence to make a prima facie case of retaliation, on the evidence before the court, no reasonable jury could conclude that the reason proffered by Prime was mere pretext for retaliation. Because there are no genuine issues of material fact, defendant is entitled to summary judgment.

## IV. Conclusion.

In sum, the court finds that Kimbrel cannot establish a prima facie case of retaliation under the ADA. However, even if Kimbrel could prove his prima facie case, the court is of the opinion that Kimbrel cannot show that the legitimate, non-discriminatory reason for his termination articulated by Prime is mere pretext for retaliation. Therefore, Prime's motion for summary judgment will be granted. A separate order will be entered.

Done, this 9th of October, 2002.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

11